IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

CHERIE LINDBERG,

    Plaintiff,

v.                          No. 03-2543 B

UT MEDICAL GROUP, INC., and
UT MEDICAL GROUP MEDICAL
AND DENTAL GROUP BENEFIT PLAN,

    Defendants.

---

ORDER GRANTING PLAINTIFF'S MOTION FOR AWARD OF
ATTORNEY'S FEES AND COSTS

---

Before the Court is the motion of the Plaintiff, Cherie Lindberg, for an award of attorney's fees and costs, pursuant to 29 U.S.C. § 1132(g)(1), Employee Retirement Income Security Act of 1974, as amended ("ERISA"), incurred in bringing this action. The statute provides that "[i]n any action under [ERISA] by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). The Sixth Circuit "has held that when a district court exercises its discretion in awarding attorney fees under ERISA, it should consider five factors:

> (1) the degree of the opposing party's culpability or bad faith; (2) the opposing party's ability to satisfy an award of attorney's fees; (3) the deterrent effect of an award on other persons under similar circumstances; (4) whether the party requesting fees sought to confer a common benefit on all participants and beneficiaries of an ERISA plan or resolve significant legal questions regarding ERISA; and (5) the relative merits of the parties' positions.

Gettings v. Building Laborers Local 310 Fringe Benefits Fund, 349 F.3d 300, 310 (6th Cir. 2003); see also Hoover v. Provident Life & Accident Ins. Co., 290 F.3d 801, 809 (6th Cir. 2002). No one

This document entered on the docket sheet in compliance
with Rule 58 and/or 79(a) FRCP on 4-28-05



factor is determinative but the court should consider each before rendering its decision. Wells v. U.S. Steel, 76 F.3d 731, 736 (6th Cir. 1996); Bertram v. Nutone Inc., No. C-1-99-218, 2001 WL 1397325, at *1 (S.D. Ohio Mar. 19, 2001). In making a fee award, the "district court must provide a clear and concise explanation of its reasons." Gettings, 349 F.3d at 309 (quoting Adcock-Ladd v. Secretary of Treasury, 227 F.3d 343, 349 (6th Cir. 2000)).

In January 2003, the Plaintiff was diagnosed with recurrent mantle cell lymphoma. At that time, she was employed by UT Medical Group ("UTMG") and was a participant in the UT Medical Group, Medical and Dental Group Benefit Plan (the "Plan"), an employee benefit plan covered by ERISA. The course of treatment prescribed by Dr. Lee Schwartzberg, her treating physician at the West Clinic in Memphis, Tennessee, called for a preparatory regimen of chemotherapy, high dose chemotherapy, followed by bone marrow transplantation ("HDC/BMT"), to be administered at MD Anderson Cancer Center ("MD Anderson") in Houston, Texas. Beech Street Corporation, a medical necessity review corporation that provided hospital pre-certification services for UTMG pursuant to a contract, issued a pre-certification letter for admission to MD Anderson for ten days. (Mem. in Supp. of Mot. for an Award of Att'y's Fees and Costs, Ex. 1.) Lindberg commenced the initial stages of therapy, which continued for some three months.

During this period, the Defendant amended its Plan, changing its definition of "experimental or investigational." The amendment ("Amendment No. 9") provided that a drug, device, medical treatment or procedure is experimental/investigative "[i]f reliable evidence shows that the drug, device, or medical treatment or procedure is the subject of ongoing Phase I, II, or III clinical trials or under study to determine its maximum tolerated dose, its toxicity, its safety, its efficacy or its efficacy as compared with the standard means of treatment or diagnosis." Amendment No. 9, made

2

retroactive to January 1, 2003, was, the Plaintiff argues, designed to preclude coverage of her treatment.

On May 15, 2003, the UTMG's third party administrator, Insurex Benefits Administrators ("Insurex"), received a letter from HCC Benefits Corporation, the Plan's stop loss policy carrier, that "the proposed non-myeloablative allogeneic stem cell transplant using the protocol 'Phase II study of nonablative allogeneic blood stem cell transplantation for patients with lymphoid malignancies' is considered experimental/investigative . . . and would not be reimbursable." (Mem. in Supp. of Mot. for an Award of Att'y's Fees and Costs, Ex. 2.) The basis for the opinion was the language of the stop loss policy, which was virtually identical to the language of Amendment No. 9. The decision was based on the conclusion that "nonmyeloablative allogeneic bone marrow transplantation is still the subject of ongoing Phase I and II clinical trials and is still under study to determine" its effectiveness in treating mantle cell lymphoma; that "the consensus among experts regarding nonmyeloablative allogeneic bone marrow transplantation is that further studies or clinical trials are necessary; and that the "addition of Redesign to a nonmyeloablative alloBMT regimen is novel." (Admin. R. at 00112 - 00113.)

The same day, an external medical review organization, ProPeer Resources, Inc., notified Insurex in response to its request that "[t]he recommendations given to this patient for a mini-transplant are precisely what we would have recommended as the best available therapy for her condition. A stem cell transplantation is a covered benefit, I would recommend approval and proceeding to transplantation as soon as possible." (Mem. in Supp. of Mot. for an Award of Att'y's Fees and Costs, Ex. 3.) With respect to this particular communication, the Defendants point out that ProPeer did not specifically address the Plan language or whether the procedure should be

3

considered experimental/investigative as had been requested by Insurex. However, the ProPeer form memorializing the request of Insurex for a review of Lindberg's proposed treatment, dated May 9, 2003, clearly indicated that the "PLAN DOCUMENT [was] ATTACHED." (Pl.'s Reply to Defs.' Resp. to Pl.'s Mot. for an Award of Att'y's Fees and Costs, Ex. 8.) Moreover, an addendum to the ProPeer medical review, dated May 28, 2003, stated that "This treatment is standard of care and not considered experimental." (Pl.'s Reply to Defs.' Resp. to Pl.'s Mot. for an Award of Att'y's Fees and Costs, Ex. 8.) Nonetheless, Insurex issued a letter to MD Anderson on May 15, 2003 advising that, based upon its review of the medical information and treatment protocol, along with its identification as a "Phase II study," the transplant would not be covered as it was experimental/investigative. (Mem. in Supp. of Mot. for an Award of Att'y's Fees and Costs, Ex. 4.)

The Plaintiff thereupon left MD Anderson and returned to Memphis without completing the course of treatment prescribed. She was referred by Dr. Schwartzberg to Dr. Donna Przepiorka at the University of Tennessee Cancer Institute for a second opinion on the medical appropriateness of the HDC/BMT treatment. On July 1, 2003, Dr. Przepiorka advised Lindberg's physician that

> . . . we strongly recommend allogeneic blood stem cell transplantation for Ms. Lindberg at this time. There is a substantial track record for long-term disease control for low-grade lymphomas utilizing allogeneic blood stem cell transplantation. The combination of fludarabine, cyclophosphamide and Rituxen is now considered the standard for this type of lymphoma. None of these medications are experimental, and all are indicated for use with this disease.
>
> We strongly recommend that Ms. Lindberg proceed to allogeneic transplantation as soon as possible . . .

(Mem. in Supp. of Mot. for an Award of Att'y's Fees and Costs, Ex. 5.) This action was initiated on July 24, 2003.

On August 22, 2003, ProPeer issued another opinion, stating at the outset that "[i]t has been

4

requested to review these treatments for the medical necessity of an allogeneic stem cell transplant, as well as whether services are considered to be standard and generally accepted for this diagnosis and whether the procedure drug, or device is investigational. Plan language has been submitted for review.." (Admin. R. at 00458.) It was determined that "[u]nder the term of plan language [sic] this is clearly an investigational, experimental treatment as defined by the plans [sic] language." (Admin. R. at 00458.)

On October 15, 2003, Magistrate Judge Tu M. Pham ordered the deposition of Dr. Przepiorka and the Plaintiff's motion for preliminary injunction was heard by this Court on November 5. On December 9, 2003, the Court entered an order holding the preliminary injunction motion in abeyance and remanding the matter to the Plan administrator. See Order Holding Pl.'s Mot. for Prelim. Inj. in Abeyance and Remanding to the Plan Admin. According to the Defendants, Lindberg resubmitted her claim for benefits for a Phase II nonmyeloablative allogeneic blood stem cell transplant to be performed by Dr. Khouri at MD Anderson. Pursuant to his affidavit, Dr. Jeffrey Woodside, executive vice president and chief medical officer of Lindberg's employer, was appointed to a special committee to reconsider the claim. He explained that

> [a]s a member of this Committee, [he] reviewed Ms. Lindberg's request for a Phase II nonmyeloablative allogeneic stem cell transplant proposed by Dr. Khouri of MD Anderson . . . on April 21, 2003 (the "original treatment"). The original treatment protocol was a Phase II clinical trial to determine maximum tolerated dose, toxicity, safety, its efficacy, or its efficacy as compared with the standard means of treatment or diagnosis. There were no Phase II studies at that time to support the use of nonmyeloablative therapy and therefore, the original treatment was considered experimental/investigational.
>
> The Committee carefully considered each of the issues presented in this Court's Order of December 9, 2003, as well as all evidence submitted by Plaintiff in her request for resubmission, which included evidence not previously considered, and determined that its first conclusion to deny the benefit claim as

5

experimental/investigational was reasonable, and therefore, not arbitrary and capricious.

(Defs.' Resp. to Pl.'s Mot. for an Award of Att'y's Fees and Costs, Ex. A (Aff. of Jeffrey Woodside, M.D. at ¶¶ 2-3.)

Coverage was once more denied on December 24, 2003, again based on the treatment's characterization as "experimental." (Mem. in Supp. of Mot. for an Award of Att'y's Fees and Costs, Ex. 7.) The decision was dependent in part on an independent medical review conducted by Dr. Skip Freedman, of AllMed Healthcare Management in Portland, Oregon, who concluded that "[m]yeloablative transplant would not be experimental or investigational, whereas a nonmyeloablative transplant is."[1] (Mem. in Supp. of Mot. for an Award of Att'y's Fees and Costs, Ex. 7.) In support of his decision, Dr. Freedman referenced an August 5, 2003 publication by Dr.

---

[1] The Plaintiff has questioned the efficacy of the AllMed opinions. The opinions include a box titled "Physician Review." The language therein begins with a statement in bold type "Reviewed by a Board Certified Hematologist/Oncologist" and continues with the reviewing physician's opinion, set out in the first person. Directly under the Physician's Review box is a signature line for Dr. Freedman and a space for the date. No other physician's name appears anywhere on the form. It has been charged by the Plaintiff that Dr. Freedman is neither a hematologist nor an oncologist, but, rather, a specialist in emergency medicine. In her third supplemental affidavit, Wanda King, Insurex's vice president of operations, stated that "[n]one of the medical reviews performed on December 17, 18, or 19, 2003 were authored by Dr. Skip Freedman. Rather, all reviews were performed by a Board certified hematologist/oncologist. Attached as collective Exhibit 2 is the correspondence I received from AllMed confirming this fact, as well as the review physician's credentials and the three AllMed reviews from December 2003." (Third Supplemental Aff. of Wanda King at ¶¶ 6-7.) Exhibit 2 consists of a form on AllMed letterhead captioned "Specialty Panel Information," listing "Medical Oncology" as the specialty area, Board status as Medical Oncology 1981 and American Board of Internal Medicine 1978, and AllMed Peer Reviewer experience from 2002 to the present. Interestingly, the form does not name an individual to whom the information refers. The only remaining documents encompassing Exhibit 2 are the AllMed opinions of December 17, 18 and 19, 2003 signed by Dr. Freedman. In any case, the Court finds it somewhat disturbing that the Defendants, even in their response to the motion for attorney's fees, still have not identified the "Board certified hematologist/oncologist" who they claim performed the review.

6

Robert S. Negrin, director of the bone marrow transplant program at Stanford University. (Id.) In February 2004, Lindberg obtained an affidavit from Dr. Negrin in which he stated that the publication referred to in the denial letter "did not expressly or inferentially assert that the course of treatment recommended" for the Plaintiff was either experimental or investigative. (Mem. in Supp. of Mot. for an Award of Att'y's Fees and Costs, Ex. 8 at ¶ 5.) He further opined that "[t]he proposed treatment for Ms. Lindberg of non-myeloablative allogeneic hematopoietic cell transplantation is appropriate and indicated. This is based upon her diagnosis of recurrent mantle cell lymphoma with a history of a prior autologous transplant. This treatment represents her best and likely only chance for achieving long term survival." (Mem. in Supp. of Mot. for an Award of Att'y's Fees and Costs, Ex. 8 at ¶ 6.) He stated that

> [t]his treatment as proposed should certainly be viewed as a covered benefit based upon the definition of "experimental/investigative" since the Plan explicitly covers bone marrow transplantation and the treatment proposed is acceptable medical practice utilizing standard chemotherapy drugs approved by the FDA.
>
> The attempt to redefine "experimental/investigative" as any patient participating in any phase I, II or III clinical trials is entirely unreasonable and restrictive. This definition would exclude the vast majority of patients undergoing any form of bone marrow transplantation and many patients undergoing other types of cancer therapies. There are circumstances in medicine where a clinical trial could truly be considered "experimental." An example would be use of a new drug without prior experience. However, these circumstances are not present here. The chemotherapy drugs to be used for Ms. Lindberg's treatment are standard and FDA-approved.
>
> Although there is not a randomized phase III clinical trial comparing non-myeloablative verses [sic] ablative allogeneic transplantation, this does not exclude non-myeloablative allogeneic transplantation as being accepted medical practice. In fact, the majority of patients who undergo non-myeloablative allogeneic transplantation are excluded from being considered for ablative allogeneic transplantation due to advanced age or other medical considerations such as Ms. Lindberg.
>
> Ablative allogeneic transplantation is not considered experimental or investigative.

7

> The non-myeloablative procedure posed for Ms. Lindberg is a similar procedure as myeloablative except with lesser intensity of the preparative regimen. The general concept of non-myeloablative transplantation should be considered the same as myeloablative transplantation and represents a change in technique rather than a change in treatment concept.

(Mem. in Supp. of Mot. for an Award of Att'y's Fees and Costs, Ex. 8 at ¶¶ 8-11.)

Plaintiff's counsel noticed the depositions of Insurex, the administrator and Dr. Freeman. Shortly thereafter, on February 9, 2004, Insurex forwarded a letter to Dr. Przepiorka stating that "we are approving your Pre-Service claim for Cherie Lindberg for allogeneic stem cell transplantation using standard nonmyeloablative regimen at the University of Tennessee Cancer Institute as requested . . . Benefits will be paid according to Organ Transplant global rates including facility and medical oncologist professional services . . ." (Mem. in Supp. of Mot. for an Award of Att'y's Fees and Costs, Ex. 9.) The Plaintiff's treatment then resumed. The treatment approved in the February 9, 2004 letter is the same protocol recommended by Dr. Przepiorka after her initial consultation. (Mem. in Supp. of Mot. for an Award of Att'y's Fees and Costs, Ex. 10, Aff. of Donna Przepiorka at ¶¶ 3, 5.) In her deposition, Dr. Przepiorka testified as follows:

> Q: In your opinion, was the course of treatment at MD Anderson considered a "clinical trial."
>
> A: The patient was to be treated on a clinical trial. The course of treatment itself could be performed outside the setting of a clinical trial.
>
> Q: The title of this protocol (the course of treatment recommended by West Clinic to be conducted then at MD Anderson) is a Phase II study of Nonablative Allogeneic Blood Stem Cell Transplantation for patients with Lymphoid Malignancies. Is there any question that the protocol recommended by MD Anderson to be performed on Cherie Lindberg is the subject of an on-going Phase II clinical trial?
>
> A: If she were treated on that protocol, it would be a Phase II trial, but

8

>  that same treatment can be given without her participation in the trial.
>
> Q: . . . I believe you said if the protocol . . . was utilized, it would be one thing, but it could be given where it would not be that thing. Could you straighten me out on that?
>
> A: Yes. Absolutely. I understand completely and it goes back to the language regarding what is research. And again, research is considered collection of data regarding human subjects. And what has been approved here is not that MD Anderson can treat the patient in this fashion, but actually that they will treat a series of patients and collect information on how those patients did for the purpose of generalizing that information to the public. But the very same treatment could be utilized by them at that institution outside the setting of a clinical trial for the exact same patient.
>
> Q: And if they weren't collecting the data, then it would be considered a Phase II?
>
> A: No, it would be considered just treatment.
>
> Q: Allright. So if this treatment regimen that is reflected on this protocol, again, if that's accurate--correct me if I'm wrong--that could be given outside of a collection of data situation?
>
> A: Absolutely.
>
> Q: Would it be exactly the same course of treatment?
>
> A: Yes it would.

(Dep. of Dr. Przepiorka at 10-11, 37, 41-42.)

The Defendants take exception, however, to the picture painted by the Plaintiff suggesting the dogged pursuit of a course of action designed to deny payment in spite of medical evidence supporting coverage. According to the Defendants, Lindberg resubmitted her benefits claim on December 15, 2003, in which she requested that reconsideration be conducted under the urgent review procedure, which gave the Defendants 72 hours to complete their review, and that

9

consideration be made by the Plan's board of directors. The Defendants immediately sought an independent medical review in order to be in compliance with ERISA. They were notified on December 16, 2003 that the initial reviewer, Medical Review Institute of America, could not complete the review. (Third Supplemental Aff. of Wanda King at ¶ 2.) On the same day, Insurex requested of AllMed an expedited peer specialty review, including a complete packet of information on Ms. Lindberg's claim containing the Plan documents, clinical notes from MD Anderson, and letters from her physicians. (Third Supplemental Aff. of Wanda King at ¶ 3.) On December 17, 2003, Insurex received notification from AllMed that the proposed treatment was considered experimental/investigational and, thus, did not comport with the Plan language. (Third Supplemental Aff. of Wanda King at ¶ 4.) AllMed confirmed in addenda dated December 18 and 19, 2003, that it had, in making its determination, reviewed the Plan language in its entirety, both before and after Amendment No. 9. (Third Supplemental Aff. of Wanda King at ¶¶ 5-6.) The Defendants then appointed a special committee, which included two physicians, to reconsider the claim taking into account all of the documentation presented from the original claim, pursuant to the Court's order, through the resubmission process. Again the claim was denied.

In late January 2004, the Plaintiff requested approval through Dr. Przepiorka of an allogeneic stem cell transplantation using a standard nonmyeloablative regimen. This study, the Defendants insist, was the first treatment request made on Lindberg's behalf that was *outside* a Phase II study. (Third Supplemental Aff. of Wanda King at ¶ 8.) The Defendants allege in their motion papers that "[d]espite Plaintiff's awareness since the deposition of Dr. Przepiorka on October 15, 2003 that a similar treatment to the treatment proposed by MD Anderson might be available outside a Phase II study protocol, Plaintiff failed to submit any new treatment plan until this time, and continued to

10

move forward with litigation." (Defs.' Resp. to Pl.'s Mot. for an Award of Att'y's Fees and Costs at 8.) On January 28, 2004, Insurex received the independent medical review of AllMed indicating that the new protocol was not experimental. (Third Supplemental Aff. of Wanda King at Ex. 5.) Specifically, the review articulated that the allogeneic HSCT (nonmyeloablative) treatment requested was "NOT experimental or investigational" and that "[a]llogeneic HSCT is the only therapeutic modality which can be administered with a curative intent. Nonmyeloablative HSCT employs adaptive immunotherapy . . . rather than dose intense chemotherapy, as in an ablative transplant." (Third Supplemental Aff. of Wanda King at Ex. 5.) An addendum to the review was issued on February 5, 2004, confirming the earlier opinion and reflecting that "the donor mobilization schedule, the evaluation of the allogeneic donor, CT scans of chest and pelvis/abdomen, treatment plans employing Fludarabine/Cytoxan and standard orders for various prophylaxes" had been reviewed. (Third Supplemental Aff. of Wanda King at Ex. 6.) Based on the review, the Plaintiff was notified by Insurex on February 9, 2004 that the transplant was approved. In their response to the instant motion, it is the position of the Defendants that "they do not deny that the treatment originally sought by Plaintiff in this lawsuit is similar to the treatment she is now receiving from Dr. Przepiorka at UT Cancer Institute. However, the fact remains that the treatment originally sought was under a Phase II study, and utilized protocol at MD Anderson in Houston, Texas, whereas the newly approved treatment is not under a Phase II study, and utilizes a standard treatment regimen at UT Cancer Institute." (Defs.' Resp. to Pl.'s Mot. for an Award of Att'y's Fees and Costs at 25-26.)

At this point, the Court will consider the five factors seriatim. As to the first, the Court finds that the Defendants' conduct was, if not in bad faith, highly culpable based on their consistent pattern of seizing on opinions recommending against coverage made by medical reviewers who never saw

11

Ms. Lindberg and whose conclusions, at least in AllMeds' case, were arguably based on questionable grounds, while completely discounting, without explanation, the statements and records of her physicians. A finding of high culpability is sufficient to establish the first factor even absent bad faith. See Hoover, 290 F.3d at 810 (district court's conclusion that first element satisfied when insurer's culpability was high even without bad faith not an abuse of discretion); Crosby v. Bowater Inc. Ret. Plan for Salaried Employees of Great Northern Paper, Inc., 262 F.Supp.2d 804, 811-12 (W.D. Mich. 2003) (culpability with respect to the first factor sufficient where there exists "the taking of positions which on their face are unreasonable and can be defended only by a sophist's resort to linguistic sleight-of-hand.").

The second factor also militates to the benefit of the Plaintiff as there is nothing to suggest that the Defendants are incapable of satisfying the fee award. The only grounds offered by the Defendants as to their inability to pay attorney's fees is a rather disingenuous one under the circumstances--that is, having to pay for Ms. Lindberg's treatment and their own attorney's fees has left them "financially strapped." The deterrent effect of such an award--the third factor--falls on the side of the Plaintiff as well. Based on its finding as to the first factor, the Court recognizes the importance of deterring the Defendants in particular and similarly situated employers in general from denying for economic reasons valid claims of severely ill employees, especially where the spectre of death looms large without timely treatment. See Bertram, 2001 WL 1397325, at *3 ("A fee award is justified in order to deter other employers or Plan administrators from" treating employees unfairly for their own benefit). The fourth factor weighs in favor of Lindberg as, even if she did not pursue this case with the intent of benefitting others, her initiation of this action has had the effect of conferring a common benefit on other participants of the Plan by encouraging her employer, as well

as others, to view claims in a more evenhanded manner. See Holford v. Exhibit Design Consultants, 218 F.Supp.2d 901, 910 (W.D. Mich. 2002) ("Whether this was Plaintiff's intent or not (the Court expects that she probably acted mostly out of self-interest), she has conferred an important common benefit on participants--i.e., she has forced her former employer into general COBRA compliance."). Finally, the Court finds that the merits of the parties' positions also tip the scale toward the Plaintiff, illustrated in no small measure by the Defendants' change of position as to coverage following the Court's remand.

In accordance with the Court's finding that an award of attorney's fees is appropriate, the next question to be addressed is the appropriate amount of the award. Counsel for the Plaintiff seeks $113,827.53 in fees, based on hourly rates of $275.00, $140.00 and $85.00, along with $67.89 in costs. "[A]n award of attorney fees must be reasonable as determined under the lodestar approach. The United States Supreme Court has explained that in applying this approach, 'the most useful starting point is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate.'" Jordan v. Michigan Conference of Teamsters Welfare Fund, No. 96-73113, 2000 WL 33321350, at *5 (E.D. Mich. Sept. 28, 2000) (quoting Hensley v. Eckerhart, 461 U.S. 424, 433 (1983)). The reasonableness of the hourly rate sought is determined based upon the "prevailing market rates in the relevant community." Id.

Even though the fee request is rather large, the Defendants do not contest the amount of fees sought or the hourly rate charged.[2] Thus, the Court finds that $113,827.53 is the appropriate lodestar amount. Nor do the Defendants argue in favor of a reduction of the fees or costs requested.

---

[2] It is also worth noting here that the Defendants advised the Court in their response to the motion for attorney's fees that their legal fees incurred in this matter were very near those spent by the Plaintiff.

13

Therefore, as there is no opposition to the requested amount, and as the Plaintiff has obtained the relief she sought, counsel for the Plaintiff is hereby awarded attorney's fees and costs in the amount of $113,895.42. See Bertram, 2001 WL 1397325, at *2 ("Where the plaintiff has obtained 'excellent results,' his attorney should ordinarily recover a fully compensatory fee" (citing Hensley, 461 U.S. at 435)).

IT IS SO ORDERED this 26th day of April, 2005.

J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT - WESTERN DISTRICT OF TENNESSEE



# Notice of Distribution

This notice confirms a copy of the document docketed as number 89 in case 2:03-CV-02543 was distributed by fax, mail, or direct printing on April 28, 2005 to the parties listed.

---

Jill M. Steinberg
BAKER DONELSON BEARMAN CALDWELL & BERKOWITZ
165 Madison Ave.
Ste. 2000
Memphis, TN 38103

Marianne Bell Matthews
BAKER DONELSON BEARMAN CALDWELL & BERKOWITZ
165 Madison Ave.
Ste. 2000
Memphis, TN 38103

Tim Edwards
GLASSMAN EDWARDS WADE & WYATT, P.C.
26 N. Second Street
Memphis, TN 38103

Honorable J. Breen
US DISTRICT COURT